**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRIAN WEARREN, | ) Case No. CV 18-9637-JGB (JPR) |
| Plaintiff, | ) |
| v. | ) ORDER DISMISSING COMPLAINT WITH |
| | ) LEAVE TO AMEND |
| JOSEPH A. GOFFERMAN et al., | ) |
| Defendants. | ) |

On November 15, 2018, Plaintiff, a state inmate proceeding pro se, filed a civil-rights action under 42 U.S.C. § 1983. He was subsequently granted leave to proceed in forma pauperis. His claims arise from his being accused of writing a confidential note about an inmate altercation.

After screening the Complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A, the Court finds that some of its allegations fail to state a claim upon which relief might be granted. Because it appears that at least some of the defects can be cured by amendment, the Complaint is dismissed with leave to amend. See Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc)

1

(holding that pro se litigant must be given leave to amend complaint unless it is absolutely clear that deficiencies cannot be cured). If Plaintiff desires to pursue any of his claims, he is ORDERED to file a first amended complaint within 28 days of the date of this order, remedying the deficiencies discussed below.

## ALLEGATIONS OF THE COMPLAINT

On May 3, 2017, Defendant "Corrections Officer Joseph A. Gofferman" and Defendant "Corrections Officer Daniel P. Soto" "searched lockers inside Dorm 4" at the California Men's Colony in San Luis Obispo. (Compl. at 3-4, 13.)[1] Plaintiff was housed in Dorm Four at the time but was not present for the search because he was "at [his] work assignment." (Id. at 4-5, 13.)

Defendants were "looking for handwriting samples to match with a confidential note" that someone had "placed inside the Dorm 4 mailbox," reporting "an altercation between two Hispanic inmates." (Id. at 4, 13.) "During th[e] search," Defendants "confiscated a pocket notebook from [Plaintiff's] locker," containing his "printed handwriting of spiritual and motivational affirmations." (Id.) They "consulted with one another (using [Plaintiff's] handwriting sample and the confidential note)" and came to "the incorrect conclusion" that he was the note's author. (Id.) The Complaint does not allege the true identity of the note's author or its purpose or intended recipient. (See generally Compl.)

---

[1] Because the Complaint is not consecutively paginated, the Court uses the pagination generated by its Case Management/ Electronic Filing system.

2

When Plaintiff "return[ed] to the dorm" he "was informed by other inmates" that Defendants "had searched lockers in the dorm and had taken [his] notebook from [his] locker." (Id. at 5, 14.) "Shift change had already occurred," and both Defendants were gone for the day; Defendant Gofferman "would not be back for 2 days due to his R[egular ]D[ays ]O[ff]." (Id.)

"During count time the same day," nondefendant inmate Walter Portillo, the "Men's Advisory Council Representative," announced that "he had spoken with Defendant Gofferman," who "informed him that 'someone had dropped a kite' (submitted a confidential note)."[2] (Id.) Gofferman also told Portillo that "[h]e knew who did it and that he was going to deal with that person when he came back," apparently referring to when he returned from his two scheduled days off. (Id.; see also id. at 23 ¶¶ 5, 7 (Portillo Decl.).)

At about 6:30 a.m. on May 6, 2017, Plaintiff noticed that Gofferman "had returned to work from his RDO's." (Compl. at 5, 14.) He "went to the Dorm 4 office to retrieve [his] personal notebook" because it "contained [his] important personal printed writings." (Id.) Gofferman gave him "permission to enter the office," and Plaintiff "stepped inside." (Id.) Gofferman did

---

[2] "Kite" is prison slang for written communication by inmates. (See, e.g., Compl. at 37.) A kite may be used for illicit communication among inmates. See Paigly v. Frauenheim, No. 15-cv-05162-HSG (PR), 2017 WL 2986244, at *5 (N.D. Cal. July 13, 2017). But institutional grievances intended for prison staff may also be referred to as "kites" or "snitch kites." See Entler v. Gregoire, 872 F.3d 1031, 1034 (9th Cir. 2017); Lyons v. Dicus, 663 F. App'x 498, 499 (9th Cir. 2016). Plaintiff apparently refers to the latter type of kite. (See, e.g., Compl. at 11-12.)

not ask him to close the door. (Id.) Plaintiff does not allege whether he asked or attempted to close the door himself. (See id.)

Plaintiff "requested that [D]efendant Gofferman return [his] notebook." (Id. at 5-6, 14.) "At this time," Gofferman "deliberately retaliated against [Plaintiff]" (id. at 6) and "acted with deliberate indifference towards [him]" (id. at 14). He "tossed [Plaintiff's] notebook onto the desk and stated, 'I know you did it.'" (Id. at 6, 14.) Plaintiff said, "Did what[?]," and Gofferman "responded[,] '[w]rote the kite.'" (Id.) "A heated discussion ensued" during which Plaintiff "den[ied]" the accusation and Gofferman "continue[d] repeatedly accusing [him], stating[,] 'I know you did it, your handwriting is identical [to that on the note].'" (Id. at 6, 15; see also id., Ex. A at 43 (Gofferman's signed statement on inmate-request form that he "reviewed [Plaintiff's] handwriting sample and it looked identical to the anonymous note").) Gofferman "also stated[,] 'Don't lie[]' and 'I don't want to hear it.'" (Compl. at 6, 15.)

Gofferman showed Plaintiff the note "to point out what he considered [to be] similarities between" it and the handwriting in Plaintiff's notebook and to "prove" that "his accusation" and the "conclusion that he . . . and [D]efendant Soto arrived at was correct." (Id.)[3]

---

[3] Plaintiff does not specifically allege how Soto was involved in "conclud[ing]" that he was the note's author. (See generally Compl. at 5-7, 14-15.) He alleges that Soto and Gofferman were both present in the office at a later conversation (see id. at 7, 15-16) but does not clarify whether Soto was present at the first office meeting or opined on any similarity between the

4

"At this point," Plaintiff "turned" and saw that another inmate, Charles Landry, "was standing inside the Dorm 4 office utility closet listening" to the accusation and the discussion between Plaintiff and Gofferman. (Compl. at 6, 15.) It is not entirely clear when Landry entered the utility closet and how long he had been there. (See generally id. at 5-6, 14-15.) Landry declares that he went into the dorm office at about 6:30 a.m. on May 6, 2017, to retrieve cleaning supplies for his work assignment, and Gofferman and Plaintiff were already in the office when he did so. (See id. at 24 ¶¶ 6-7 (Landry Decl.); cf. id. at 6, 15 (implying that Landry was already in closet when Plaintiff entered office).) Landry stood "thereafter with a look of amazement on his face." (Id. at 6, 15.)

Plaintiff "then turned all the way around" and noticed another inmate, James Batchelor, "standing outside the office door in the hallway listening to the accusation against [him] and the discussion thereafter." (Id.) Other inmates were evidently also standing in Batchelor's general vicinity and listening to the conversation between Plaintiff and Gofferman. (See id.) Plaintiff apparently had his back facing the doorway during most or all of the conversation, but Gofferman was facing the door and "knew" that other inmates were listening to his "accusation." (Id. at 7, 15.) Plaintiff "turned to Landry and stated[,] 'I

---

note and Plaintiff's handwriting at that time (see id. at 6). Soto himself has stated only that "Officer Gofferman did ask me for my opinion to compare [the note with] handwriting samples from a writing tablet that was in [Plaintiff's] possession." (Id., Ex. B at 45.)

5

didn't do it.'" (Id.) He then "said the same to [D]efendant Gofferman" and "exited the office." (Id.) He apparently then went to breakfast. (Id.)

When he "returned from breakfast," Plaintiff "noticed that [D]efendant Soto was sitting in the Dorm 4 office with [D]efendant Gofferman having a conversation." (Id. at 7, 15-16.) "After approximately 20 minutes of conversation," Gofferman "came to [Plaintiff's] bed area," where he had been sitting since sometime after his initial observation of the two Defendants. (Id. at 7, 16.) Gofferman "summoned [him] to the dorm office with him and [D]efendant Soto." (Id.) When Plaintiff went into the office with Gofferman, Soto was already sitting there. (Id.) "[A]s a form of punishment[,] [D]efendant Gofferman immediately told [him] that he was moving [him] out" of Dorm Four (a "45-man honor dorm") and into Dorm Nine (a "90-man nonprogramming C-status dorm") because Gofferman believed that Plaintiff "had written the 'kite.'" (Id.) Plaintiff does not specifically allege whether or to what extent Soto expressed a similar belief or otherwise participated in the decision to move him. (See id.) Plaintiff told both Defendants that he "didn't do it." (Id.) Gofferman responded, "I think you did." (Id.) Plaintiff "then took the bags that [D]efendant Gofferman gave to [him] to put [his] property in," "exited the office," "went to [his] bed area," and "began to pack [his] property." (Id.)

"As soon as" he had "started to pack," three inmates approached Plaintiff and told him "that they had heard" that Gofferman had accused him "of dropping a kite" and that it had "already spread all over the yard," and the three unnamed inmates

6

"believed it was dangerous to [his] safety." (Id. at 8, 16.) "Soon thereafter," a fourth inmate approached Plaintiff and "stated the exact same thing." (Id.) That inmate also indicated that a fifth inmate, "who did not live in Dorm 4," "wanted to speak with [Plaintiff] outside about what was going on." (Id.) Plaintiff "spoke with this inmate quickly and told him" that he hadn't "do[ne] it."[4]

Plaintiff "then went directly to the Dorm 4 office," where Gofferman "was sitting alone." (Id.) He told Gofferman that "what he was doing was dangerous" and that he "need[ed] to speak with the Lieutenant." (Id.) Gofferman asked if Plaintiff was "refusing to move." (Id.) Plaintiff responded, "I'm not refusing to move, but what you are doing with this type of accusation is dangerous," and he reiterated that he wanted "to speak with the Lieutenant." (Id.) After Plaintiff denied for the second time that he was refusing to move and requested again to see a lieutenant, Gofferman "radioed for support," and Soto and nondefendant "Officer John" "responded to the radio call," apparently by coming to the Dorm Four office. (Id. at 8, 16-17.) Soto "handcuffed" Plaintiff, and "he and Officer John" "escorted" him "across the yard handcuffed in front of the inmate population," which Plaintiff contends was "an implication of guilt to this inflammatory accusation." (Id. at 8, 17.)

The officers took Plaintiff to the "Echo Facility Program

---

[4] The Complaint does not clarify whether the person Plaintiff spoke with was the fourth inmate, who apparently did live in Dorm Four, or the fifth inmate, who did not. (See Compl. at 8, 16.)

7

Office." (Id.) When they got there, Soto took Plaintiff to the "Disciplinary Office" and "locked [him] in a 3 x 3 ft. cage," where he remained for about two hours. (Id.) While he was in the "cage," he "was coerced" by nondefendants Sergeant "V.B. Miller" and "Corrections Officer D. Fouts" to sign a "CDC-128 chrono" stating that "[he] was not in fear of [his] safety." (Id. at 8-9, 17.) Miller and Fouts told him that "if [he] did not sign this chrono [he] would be placed in Ad[ministrative] Seg[regation]." (Id. at 9, 17.) Plaintiff signed the chrono but "placed a large 'X' after [his] signature to signify that [he] was signing" "under duress." (Id.) Only after signing the form was he "released back to the yard." (Id.) He "went back to Dorm 4" to pack his property and "moved to Dorm 9," as Gofferman had ordered. (Id.) "Upon entering Dorm 9," another inmate "immediately approached" Plaintiff and told him, "The[y're] saying bad stuff about you[,] Brian," apparently referring to rumors that Plaintiff had written the note. (Id.) The Complaint does not allege the identity of the Dorm Nine inmate or the people who were "saying bad stuff" about Plaintiff, what "bad stuff" they allegedly said, or whether they or anyone else was explicitly threatening Plaintiff's safety. (See id.)

At 6:30 a.m. on May 16, 2017, Plaintiff "served" Soto a "CDCR Form 22 - Inmate Request for Interview" as Soto "was walking to his morning post at the Echo Facility [p]edestrian gate." (Id.) In that request, which Plaintiff has attached to the Complaint as part of Exhibit B, he accused Soto of having searched his locker and taken his "property" and sought to interview him as to how he "c[a]me to the conclusion that

8

[Plaintiff] wrote this kite" and "what training (technical if any)" Soto had to "make this conclusion." (Id., Ex. B at 45.) When Soto read the form, he "realized [Plaintiff] was filing a CDCR 602 grievance on his and [D]efendant Gofferman's accusation" and their "actions that placed [his] life in danger," and Soto responded, "I can't believe you are doing this." (Compl. at 9, 17-18.) Plaintiff requested that Soto sign the form "stating that he received it," and Soto apparently agreed to do so. (Id. at 9, 18; see also id., Ex. B at 45.)

In his written response on the form, evidently done that same day, Soto denied searching Plaintiff's locker or taking "any of [his] personal property" and admitted only that Gofferman had "ask[ed]" for his "opinion to compare handwriting samples from a writing tablet" in Plaintiff's "possession" with a "note that was dropped in the Dorm 4 mailbox." (Id., Ex. B at 45.) Soto's written response did not indicate what opinion he reached or how he reached it. (See id.)

After Soto had signed the form and given Plaintiff a copy, Plaintiff "turned to walk to the pedestrian gate to wait for work call." (Compl. at 9, 18.) As he did so, he "and several inmates" heard Soto say, "You're dropping another kite." (Id.; see also id. at 28 ¶ 4 (Williams Decl.).) Plaintiff "was immediately angered by this remark" but "did not want to respond angrily" out of fear that Soto would make another "false accusation" or engage in "an aggressive act." (Id. at 9-10, 18.) He walked on toward the pedestrian gate and waited there for "work call" as Soto "passed by and assumed his post." (Id. at 10, 18.)

"Upon work call," Plaintiff "went through the pedestrian gate" where Soto was posted and Soto "asked [him] to come and talk to him after [he] ate breakfast and before [he went] to work." (Id.) Plaintiff complied and after eating returned to the pedestrian gate to speak with Soto. (Id.) Soto requested that Plaintiff "drop this issue" and "stated [][t]hat he wanted to work this situation out" because he "kn[e]w[] how this could go" if the "administration" became aware of it or "g[o]t involved." (Id. at 10; see also id. at 18.) Soto "asked [Plaintiff] not to file a grievance" and "in return he would move [him] back into a 45-man dorm (Honor dorm)." (Id. at 10, 19.) Plaintiff replied that "it was no longer about the move from a 45-man dorm" but that Soto and Gofferman had "placed [his] life in danger." (Id.)

"Soto then suggested" that Plaintiff "move to another yard," but Plaintiff said that "w[ould] not solve anything" because "[t]his type of accusation" "will follow [him] wherever [he] go[es]." (Id.) He asked Soto why he had said, "You're dropping another kite," and Soto said, "I was just blowing off steam." (Id.) Plaintiff pointed out that that was a "dangerous" way to "blow off steam," apparently because "[o]ther inmates heard that statement." (Id. at 10-11, 19.) Soto "nodded his head" and "again asked" Plaintiff to "drop this process and not file a 602 grievance." (Id. at 11, 19.) Plaintiff asked Soto why he thought he had written the kite and Soto said, "maybe you thought you were doing the right thing." (Id.) Plaintiff told him that he had "the right to report misconduct, a crime, an altercation, or write anything that is not threatening if [he] cho[]se to do

10

so," but he denied writing the kite. (Id.) Soto "asked [him] again to drop this because he did not want [the] administration to get involved" and repeated his offer to move Plaintiff "back into a 45-man dorm." (Id.) Plaintiff said he "would consider it" and went to his work assignment. (Id.) He evidently did not drop the matter but filed an administrative appeal and pursued it to the third and highest level of review at the state prison system's Office of Appeals in Sacramento. (See id. at 33-40.)

Defendants' accusation caused Plaintiff to be "labeled" a "Snitch and Informant," presumably by other inmates. (Id. at 11, 20.) Defendants' conduct has caused him to "feel that [he] could never report a crime[] or any type of misconduct for fear of retaliation from CDCR officials." (Id. at 12.) "For several weeks" after the accusation he was in a "precarious position" in which he "had to defend [himself] daily against verbal attacks and ward off physical assault" (id. at 11, 19-20) because "the prison code and the gang code require[] the gangs to assault or kill someone labeled a 'Snitch and Informant'" (id. at 12, 20). "The accusation was particularly inflammatory" because Plaintiff, who is black, was accused of "inform[ing] on another race (Hispanic)." (Id. at 11, 20.) He does not allege that he was actually physically assaulted at any time (see generally Compl.), but a declaration attached to the Complaint describes an undated incident in which another black inmate, evidently at CMC, was accused of being a "rat and snitch" and had his locker searched and unspecified property seized. (See id. at 31 ¶¶ 2, 6 (Cowan Decl.).) That inmate, Clarence Warren, was assaulted two weeks later by fellow inmates whose race is not specified and was then

11

"removed from the institution." (See id. at 31-32 ¶¶ 7, 11.) Nondefendant "Officer Brehm" was responsible for the locker search that allegedly led to Warren's assault and transfer (see id. ¶¶ 3-11), but Plaintiff alleges that Gofferman and Soto were "assigned to the same yard the attack occurred on" and "were eventually made aware of [it] and why it took place" by an unspecified party at an unknown time. (Id. at 21.)

Plaintiff contends that the safety of the inmate population "was also placed in jeopardy" by Defendants' conduct "because it pitted the Hispanic and Black inmate population[s] against one another once the Black population decided" that he "would not be forcibly removed." (Id. at 20.) "This event," apparently referring to the early May 2017 accusation, "also jeopardized the safety and security of the institution" and its staff "for threat of a racial riot." (Id.)

Plaintiff brings claims for deprivations of his First and Eighth amendment rights.[5] (See id. at 4, 13.) He sues Defendants Gofferman and Soto in their individual and official

---

[5] Plaintiff's administrative appeals included allegations that he was denied due process under the 14th Amendment (see Compl. at 36-40), but the Complaint specifically enumerates only two causes of action, one under the First Amendment and the other under the Eighth (see id. at 4, 13). To the extent Plaintiff did not intend to abandon his due process theory, he does not have a stand-alone due process right to be protected from false allegations. See Harper v. Costa, 393 F. App'x 488, 489 (9th Cir. 2010) (affirming dismissal of action claiming that false prison disciplinary charges violated plaintiff's constitutional rights); Henry v. Miranda, No. 1:16-cv-00458-EPG (PC), 2017 WL 363013, at *3-4 (E.D. Cal. Jan. 25, 2017) (collecting cases); see also Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (Constitution does not create due process liberty interest in prisoner's avoiding "more adverse conditions of confinement").

12

capacities. (Id. at 3.) He seeks one dollar in "nominal damages"; $125,000 in punitive damages against each named Defendant; an injunction "ordering the California Department of Corrections to construct and put forth procedures" directing its officers and administrators "on what actions and steps . . . must be taken in a situation dealing with an anonymous note" and requiring that Defendants and their colleagues be trained on those procedures "immediately after they are constructed"; declaratory relief; and recovery of his court fees. (Id. at 22.)

**STANDARD OF REVIEW**

A complaint may be dismissed as a matter of law for failure to state a claim "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1041 (9th Cir. 2010) (as amended) (citation omitted); accord O'Neal v. Price, 531 F.3d 1146, 1151 (9th Cir. 2008). In considering whether a complaint states a claim, a court must generally accept as true all the factual allegations in it. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Hamilton v. Brown, 630 F.3d 889, 892-93 (9th Cir. 2011). The court need not accept as true, however, "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted); see also Shelton v. Chorley, 487 F. App'x 388, 389 (9th Cir. 2012) (finding that district court properly dismissed civil-rights claim when plaintiff's "conclusory allegations" did not support it). Although a complaint need not include detailed factual allegations, it "must contain sufficient

13

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); Yagman v. Garcetti, 852 F.3d 859, 863 (9th Cir. 2017). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (citations omitted); Byrd v. Phx. Police Dep't, 885 F.3d 639, 642 (9th Cir. 2018) (per curiam) (citations omitted).

## DISCUSSION

**Plaintiff Has Not Stated Any Official-Capacity Claim**

Plaintiff sues both Defendants in their official and individual capacities. (See Compl. at 3.) The Supreme Court has held that an "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985); see also Brandon v. Holt, 469 U.S. 464, 471-72 (1985). Such a suit "is not a suit against the official personally, for the real party in interest is the entity." Graham, 473 U.S. at 166 (emphasis in original). Thus, Plaintiff's official-capacity claims are properly treated as claims against the State. Shilling v. Crawford, 377 F. App'x 702, 704-05 (9th Cir. 2010) (suits against state officials in official capacity for damages are "no different than suits against the state itself"); Leer v. Murphy, 844 F.2d 628, 631-32

14

(9th Cir. 1988) (finding claims against prison correctional officer, warden, and other officials in official capacity to be claims against State).

Based on sovereign-immunity principles, the 11th Amendment dictates that the State, its agencies, and its officials acting in their official capacity cannot be sued for money damages. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); Dittman v. California, 191 F.3d 1020, 1025-26 (9th Cir. 1999) ("The State of California has not waived its Eleventh Amendment immunity with respect to claims brought under § 1983 in federal court . . . ."); Leer, 844 F.2d at 631-32 (holding that 11th Amendment bars official-capacity actions for damages). Thus, Plaintiff's § 1983 claims for money damages against Defendants in their official capacity are barred by the 11th Amendment. See Brown v. Cal. Dep't of Corr., 554 F.3d 747, 752 (9th Cir. 2009) (holding that CDCR was entitled to 11th Amendment immunity); Pena v. Gardner, 976 F.2d 469, 472 (9th Cir. 1992) (per curiam) (as amended) (claims for damages and retroactive relief against state prison officials sued in official capacity barred by 11th Amendment).

Thus, because Plaintiff cannot seek damages against Defendants in their official capacity, those claims are dismissed without leave to amend.

The 11th Amendment does not bar official-capacity claims against state officials for prospective injunctive relief, to end a continuing violation of federal law. See Ex parte Young, 209

U.S. 123, 155-57 (1908); Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d 836, 839 (9th Cir. 1997).

Here, although the Complaint includes a claim for injunctive relief (see Compl. at 22), it does not allege any continuing violation of federal law. The events in the Complaint occurred between May 3 and 16, 2017, more than a year ago. (See, e.g., id. at 3.) Plaintiff alleges that he was in a "precarious position" "[f]or several weeks" after the accusation (see id. at 11, 19-20) but has not alleged any facts as to what happened after that. Nor has he alleged facts as to any threats or injuries to his personal safety or ability to file grievances, whether Gofferman and Soto are still employed at CMC or by the CDCR, or whether other officers regularly engage in similar behavior. The injunction Plaintiff seeks would order the state prison system to implement standard procedures to deal with "anonymous note[s]" (id. at 22), but the Complaint does not allege whether any such procedures existed at the time of Defendants' conduct, whether Defendants followed those procedures, and if so what was deficient about them. Moreover, some of its allegations suggest that Defendants' behavior was not in accordance with existing state rules and regulations or institutional policy. (See, e.g., id. at 18 (Soto "wanted to work this situation out" without administration's involvement), 22 ¶¶ 5-6 (seeking declaration that Defendants violated state regulations and CDCR's Code of Conduct), 35 (Plaintiff's administrative appeal characterizing Defendants' actions as "Employee Misconduct").)

Accordingly, Plaintiff has not adequately pleaded any

ongoing violation of federal law, much less one that would be remedied by the prospective injunctive relief he seeks. As Defendants are immune from suit for damages in their official capacity, his official-capacity claims fail. See Will, 491 U.S. at 71; Pena, 976 F.2d at 472. Should he elect to pursue them in an amended pleading, he must allege facts in accordance with the standards outlined above.

*********************

If Plaintiff desires to pursue his claims, he is ORDERED to file a first amended complaint within 28 days of the date of this order, remedying the deficiencies discussed above. The FAC should bear the docket number assigned to this case, be labeled "First Amended Complaint," and be complete in and of itself, without reference to the original Complaint or any other pleading, attachment, or document. **Plaintiff is warned that if he fails to timely file a sufficient FAC, the Court may dismiss this action on the grounds set forth above or for failure to diligently prosecute.**

DATED: December 31, 2018

JESUS G. BERNAL
U.S. DISTRICT JUDGE

Presented by:

Jean P. Rosenbluth
U.S. Magistrate Judge

17